573 So.2d 764 (1990)
Sandra CHISOLM
v.
Ervin Dale EAKES.
No. 89-CA-1266.
Supreme Court of Mississippi.
December 19, 1990.
*765 G. Jyles Eaves, Louisville, for appellant.
Helen McDade, DeKalb, for appellee.
Before HAWKINS, P.J., and PITTMAN and BLASS, JJ.
PITTMAN, Justice, for the Court:
This appeal arises from a paternity action, in which Sandra Chisolm alleged that Ervin Dale Eakes was the father of her daughter, Shauna Ladale Chisolm. A jury trial resulted in a finding that Eakes was not the father. Chisolm moved for a new trial or in the alternative a j.n.o.v. The motion was denied. Finding no error, we affirm the judgment of the chancery court.

I.
On October 2, 1976, Sandra Chisolm gave birth out-of-wedlock to a daughter, Shauna Ladale Chisolm. On July 7, 1988, Sandra Chisolm filed, in Neshoba County Chancery Court, a Complaint to Determine Paternity, and for Other Relief, alleging that Ervin Dale Eakes was the father of Shauna. She also asked that Eakes pay child support and provide health insurance, health care coverage and all medical support. Eakes answered and denied that he was Shauna's father. Eakes moved on September 22, 1988, for a jury trial on the issue of paternity. An agreed order compelling Sandra Chisolm, Shauna Chisolm, and Dale Eakes to undergo blood tests was entered by the chancery court on October 13, 1988.
The trial in this cause was held on August 2, 1989. Dr. Nicholas R. Brownlee, the director of Parentage Testing at Smithkline Bio-Science Laboratories in Atlanta, Georgia, was admitted as an expert in the area of paternity testing. He testified that his laboratory had received the blood samples from the mother, child, and putative father, and had used the samples to perform the human leukocyte antigen (HLA) test. Brownlee testified that the HLA test showed that there was a probability of 99.59649% that Dale Eakes was the father of Shauna Chisolm. Brownlee could not say with 100% certainty that Eakes was the father. Brownlee stated that one out of every 20,000 Caucasian males would have the same test results as Eakes. Brownlee agreed that DNA testing was also being used to determine paternity, but said that it was his laboratory's procedure not to use it unless a probability of less than 98% was achieved on the HLA test.
The remaining testimony involved the nature of the relationship between Sandra Chisolm and Dale Eakes at the time of the conception of Shauna Chisolm. Sandra Chisolm testified that a friend introduced her to Dale Eakes in May 1974. Eakes moved in with her at that time or soon after, and stayed until the latter part of July, when Sandra asked him to leave. She and Eakes continued to see each other until November 1974. At this time Chisolm stated that she did not hear from Eakes again until December 27, when he called to say that the day before, the 26th, he had gotten married. Chisolm stated that Eakes continued to call her but she refused to see him while he was married. Chisolm resumed her relationship with Eakes, including sexual relations, after Eakes was divorced in September 1975. She testified that she had sex with Eakes on December 4, 1975, and then again on December 26, 1975. Chisolm was not using any birth control during this time because of a problem with blood clots.
On the evening of January 2, 1976, Eakes invited several people over to his trailer for stew. Chisolm stated that she arrived late, at around 9:00 p.m., as she had been working that day as a hairdresser. Chisolm stated that she had sexual relations with Eakes that evening. She went over to Eakes' trailer on January 19, 1976, and informed him that she might be pregnant. Eakes in turn behaved very coolly toward her. Chisolm denied that she had had sexual relations with any other man except Eakes from September 1975 through January 19, 1976. Chisolm testified that she was legally married at the time of the trial, but that she and her husband were separated. Chisolm agreed *766 that she did not list Eakes as the father on Shauna's birth certificate, as she was angry at him at the time. As to why Chisolm had waited so long to bring the suit, she stated that Eakes had hurt her so badly that she was not in any emotional shape to deal with a lawsuit. She also stated that financial need had finally caused her to bring the suit. She testified that Shauna had incurred medical bills due to peritonitis, that her other daughter had reached eighteen years of age and had stopped receiving social security, and that her son, 27, was schizophrenic and totally disabled. Chisolm stated that she did have a hairdressing business, but needed help as far as supporting her children.
Barbara Willis worked for Sandra Chisolm in December 1975 as a receptionist in Chisolm's beauty shop. Willis was dropped off at the Chisolm house by her husband at between 5:30 and 6:00 on the morning of December 27, 1975, so that she and Sandra could ride to work together. She testified that on this particular morning she saw Dale Eakes sitting at the bar in Chisolm's house, drinking coffee.
Dale Eakes testified that he had had a relationship with Sandra Chisolm in June and July of 1974, but had had nothing to do with her since that time and had never lived with her. He denied that he had been seen by Barbara Willis, drinking coffee, at Sandra Chisolm's house early on the morning of December 27, 1975. Eakes affirmed that he had hosted a dinner at his trailer on January 2, 1976. He denied that he had invited Sandra Chisolm or that she was ever with him that evening, although he agreed that she was there. He testified that he had spent the evening with Della Vicks, his girlfriend. Eakes claimed that after everyone had left he took Vicks home and went back to his mother's for the evening. Eakes testified that he was working offshore in Louisiana during late 1975 and 1976, and that he had left Philadelphia on January 3, 1976, the day after the dinner, for Louisiana. Eakes said that he usually travelled to Louisiana by bus, which he would board in Meridian. Eakes claimed that he was working offshore on January 19, 1976. He testified that he had only found out about the claim of paternity in September of 1988. Eakes said that he had agreed to take the blood tests because he knew he wasn't the father of Shauna Chisolm, but if she had been his daughter, he would have acknowledged her.
The jury returned with a verdict in favor of Dale Eakes. Sandra Chisolm subsequently moved for a new trial or in the alternative, a j.n.o.v. This motion was overruled, and this appeal was perfected.

II.
Sandra Chisolm argues that the verdict of non-paternity was against the overwhelming weight of the evidence and that there was insufficient evidence to support the jury verdict. Because there is conflicting testimony concerning the critical dates of conception, the principal controversy concerns the weight to be given the results of the HLA blood tests.
The chancery court has the authority, on motion of the plaintiff, defendant, or itself, to order blood tests in a paternity case. Miss. Code Ann. § 93-9-21 (Supp. 1988). Miss. Code Ann. § 93-9-27 (Supp. 1988) provides:
If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If an expert concludes that the blood or other tests show the probability of paternity, such evidence shall be admitted.
This Court has recognized HLA testing as a "recent scientific development which has advanced the role of blood and tissue type testing in paternity cases." Baker by Williams v. Williams, 503 So.2d 249, 253 (Miss. 1987).
The defendant in a paternity action may demand a trial by jury. Miss. Code Ann. § 93-9-15 (1972). The burden of proof in a paternity action, where the putative father is alive, is by a preponderance of the evidence. Ivy v. State Dept. of Public Welfare, 449 So.2d 779, 782 (Miss. 1984). Another factor which may be valuable *767 to a jury in reaching its decision on paternity is its opportunity to view the child in question, along with the mother and the putative father. Clark v. Whiten, 508 So.2d 1105, 1109 (Miss. 1987).
This Court has dealt with the matter of weight of the evidence in paternity cases. In Grimsley v. Tyner, 454 So.2d 482 (Miss. 1984), Grimsley, the putative father, was the plaintiff. The testimony concerning conception was in conflict. More than a year after the birth of the child in question Grimsley and Tyner, the mother, executed a sworn acknowledgment that Grimsley was the father of the child. They also entered into an agreement for visitation and support of the child. They also took steps to have the child's birth certificate altered, so that Grimsley would be listed as the father. Finally, HLA testing was done, and showed a 99.6% plausibility of paternity. Grimsley, 454 So.2d at 483-484. The jury found that Grimsley was not the father. This Court reversed and remanded, finding that this verdict was against the overwhelming weight of the evidence. Another factor, recognized by this Court as plain error, was the submission of the case to the jury at 11:30 p.m., and the resulting deliberations which lasted until 4:30 a.m., when a verdict was reached. Grimsley, 454 So.2d at 484-485.
The case at bar may be distinguished from Grimsley. The actions of the parties in Grimsley presented strong evidence that the parties had acquiesced in the fact that Grimsley was the father of the child. There were no such actions in this cause. It appears that Chisolm and Eakes had little or no contact with each other for the eleven years between the time of the birth of Shauna Chisolm and the filing of the paternity action. Also, the jury in this cause was not forced to deliberate in an unreasonable manner.
Other jurisdictions have dealt with the problem of evaluation of the weight of the evidence where the jury seems to discount or ignore reliable scientific testimony. The general rule appears to be that HLA test results, properly authenticated and supported by other evidence, are admissible as evidence of paternity, but are not necessarily conclusive. South Carolina Dept. of Social Services v. Bacot, 280 S.C. 485, 313 S.E.2d 45 (Ct.App. 1984); see generally Annotation, Admissibility, Weight and Sufficiency of Human Leukocyte Antigen (HLA) Tissue Typing Tests in Paternity Cases, 37 A.L.R. 4th 167 (1985). The jury may consider the expert testimony for what they feel that it is worth, and may discard it entirely. Jackson v. Jackson, 253 Ga. 576, 322 S.E.2d 725 (1984); see also Schoppe v. Applied Chemicals Div., 418 So.2d 833 (Miss. 1982) (expert opinions are to be weighed and judged in view of all testimony and are to be given such consideration as jury believes is deserved). As the South Carolina Court of Appeals stated in Bacot:
There is an unfortunate trend in our society to rely on science and technology to provide an easy and absolute answer to every question. For this reason, we would caution that the results of blood tests once received into evidence should not be viewed as absolutely determinative of the issue of paternity. Instead, they should be carefully weighed by the trier of fact in every case along with the other evidence before the court. It is after all the sole responsibility of the court to make the ultimate decision on this issue based on all the evidence before it.
Bacot, 313 S.E.2d at 48.
Dale Eakes relies on State v. Hagen, 382 N.W.2d 556 (Minn. Ct. App. 1986). Hagen, the putative father, admitted having sex with Wilberg, the mother, but not during the critical time of conception. The HLA tests showed a likelihood of paternity of 99.62%. The jury found that Hagen was not the father. Hagen, 382 N.W.2d 557-558. Wilberg argued on appeal for a new trial. In affirming the trial court, the Minnesota Court of Appeals found:
A blood test is only one factor to be considered and weighed by a jury in determining paternity. Since the blood tests are not conclusive evidence of paternity, the jurors also were required to consider whether Hagen and Wilberg engaged *768 in sexual intercourse between mid-February and mid-March. The jury, here, obviously believed that Hagen did not have access to Wilberg during the time of conception. This is a credibility determination. Credibility determinations are for the finder of fact and should not be disturbed on appeal.
Hagen, 382 N.W.2d at 559 (citations omitted).
Much like Hagen is Smith v. Shaffer, 511 Pa. 421, 515 A.2d 527 (1986), where Smith alleged that Shaffer had fathered her child. A jury trial was held in the Court of Common Pleas. Shaffer introduced evidence to show that Smith had engaged in sex with other men during the conception period. The HLA tests showed a 99.99% probability that Shaffer was the father. The jury found in favor of Shaffer. The Court of Common Pleas, sitting en banc, granted Smith's post-trial motion for new trial, partially because the verdict was against the weight of the evidence. Smith, 515 A.2d at 528. The Superior Court affirmed. The Pennsylvania Supreme Court reversed and reinstated the original jury verdict. It found that Court of Common Pleas had invaded the province of the jury in discounting the credibility of the testimony in favor of Shaffer. It also found that the court had placed too much emphasis on the HLA test results in light of the jury's finding that Shaffer's witnesses were credible. Smith, 515 A.2d at 529.
In In re E.G.M., 647 S.W.2d 74 (Tex.Civ. App. 1983), the Texas Department of Human Resources brought a non-jury paternity action against G.M., alleging that he had fathered E.G.M. The applicable burden of proof was by a preponderance of the evidence. Based on four tests, including HLA, an expert witness placed the probability of G.M.'s paternity at 98.9%. G.M. merely denied the allegations. The trial court found that G.M. was not the father. The Court of Appeals reversed and remanded, finding the trial court's decision to be against the great weight and preponderance of the evidence. It also stated:
While paternity may be conclusively disproved, conclusive proof of paternity remains an unattainable goal. With the full knowledge of "... lurking problems with respect to proof of paternity", we necessarily deal in probabilities, and as such probability of paternity is not entitled to that decisive weight accorded evidence of exclusion of paternity. Even probabilities that are high do not necessarily compel a particular finding as a matter of law. Nor do we think that the results of high probability standing alone necessarily equate to a preponderance of the evidence.
A trial of paternity is essentially a trial of the complaining mother's credibility. Medical testimony merely aids to corroborate or discredit her testimony. As such, blood testing assists in the truth finding process but does not compel a decision in a non-exclusion case. The role of the fact finder is preserved and findings will not be disturbed by the reviewing court merely because the findings are against the preponderance of the evidence, if they are supported by some evidence of probative force.
E.G.M., 647 S.W.2d at 78 (citations omitted).

III.
Sandra Chisolm assigns as error the failure of the chancery court to grant her motion for a j.n.o.v. The applicable standard is the following:
Where a motion for j.n.o.v. has been made, the trial court must consider all the evidence in the light most favorable to the non-movant, who must also be given the benefit of all favorable inferences that may be reasonably drawn from the evidence; if the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the verdict is required; on the other hand, if there is substantial evidence opposed to the motion, i.e. evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand.
Maxwell v. Illinois Central Gulf R.R., 513 So.2d 901, 904-905 (Miss. 1987) (quoting Stubblefield v. Jesco, Inc. 464 So.2d 47, 54 *769 (Miss. 1985)). Under this standard, we find that the chancery court correctly denied the motion for j.n.o.v.
Sandra Chisolm also argues that the jury verdict was against the weight of the evidence, especially the HLA test results, and that a new trial should have been granted. In such a case this Court views the credible evidence in the light most favorable to the non-moving party. Reversal for failure to grant the new trial will occur only if it is clear that the trial court abused its discretion in doing so. Maryland Cas. Co. v. City of Jackson, 493 So.2d 955, 961 (Miss. 1986); Miss.R.Civ.P. 59.
The record shows that there was a delay of nearly twelve years between the birth of Shauna Chisolm and the filing of the paternity suit. Dale Eakes testified that he had no knowledge of his alleged paternity until the filing of the suit. Sandra Chisolm did not fare well under cross-examination. Cross-examination of Dale Eakes was practically non-existent. The jury was able to view mother, daughter, and putative father. As for the HLA tests, nothing we say here is meant to impugn or denigrate their potential value to the courts of this state. As long as a defendant in a paternity action has a right to a jury trial, and absent some statutory pronouncement, paternity test results, even those showing a high probability of paternity, cannot be conclusive as a matter of law. The weight to be given such evidence, along with the credibility of the parties involved, will remain a question for the chancery court or the jury. We find no abuse of discretion in the denial of the motion for new trial. The judgment of the chancery court is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
PRATHER, J., dissents without written opinion.